IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON, | |
| Plaintiff/Counter-Defendant, | CIVIL NO. 10-1796 |
| v. | **OPINION** |
| SALVATORE ALESI, GMAC MORTGAGE, ALLY BANK CORP., | |
| Defendants/Counter-Claimants/Cross-Claimants/Counter-defendants/Cross-Defendants. | |

<u>Appearances</u>:

MICHAEL JOSHUA NEEDLEMAN
SPECTOR GADON & ROSEN
7 PENN CENTER
1635 Market Street
6th Floor
PHILADELPHIA, PA 19103
*Attorney for plaintiff and counter-defendant Certain Underwriters at Lloyd's of London*

STANLEY B. CHEIKEN
261 OLD YORK ROAD
SUITE 503
JENKINTOWN, PA 19046
*Attorney for defendant, counter-claimant, and cross-defendant Salvatore Alesi*

BRIAN M. FLEISCHER
FLEISCHER & FLEISCHER
PLAZA 1000 AT MAIN STREET
SUITE 208
VOORHEES, NJ 08043
*Attorney for defendant, cross-claimant, and counter-claimant GMAC Mortgage, Ally Bank Corporation*

**HILLMAN,** District Judge

      Before the Court are a motion for partial summary judgment and cross-motion for summary judgment filed by plaintiff and counter-defendant Certain Underwriters at Lloyd's of London ("Lloyd's), a motion for partial summary judgment against Lloyd's filed by defendant, crossclaimant, and counterclaimant GMAC Mortgage and Ally Bank Corporation (collectively "GMAC"), and a motion for partial summary judgment against Salvatore Alesi ("Alesi") filed by GMAC.  For reasons explained below, Lloyd's motion for partial summary judgment against Alesi will be granted in its favor as to the personal contents claim, the lost rental income claim, and Alesi's bad faith claim.  Lloyd's motion will be granted in part and denied in part as to its claim of violation of the New Jersey Insurance Fraud Prevention Act.  Lloyd's motion regarding its requests for admissions directed to Alesi will be denied.  GMAC's motion for partial summary judgment against Lloyd's will be denied, and Lloyd's cross-motion for summary judgment will be granted with regard to GMAC's claim to the insurance proceeds for the property claim.  GMAC's motion against Alesi on grounds that Alesi agreed to "net zero" on the sale of the premises including the insurance proceeds will be denied due to the ambiguity of the agreement.

    I.    **BACKGROUND**

      This declaratory judgment matter involves a dispute over

an insurance claim for damage sustained to real property located at 7608 Bayshore Drive, Margate, New Jersey ("premises").  In or about May 2002, Salvatore Alesi purchased the premises in cash for more than $300,000, and then borrowed money to make improvements.  In 2005, Alesi married Sherri Krasner ("Krasner") and the two lived in the premises together.  In July 2007, the couple began divorce proceedings.  Although the couple reconciled, Krasner later sought and was awarded a temporary restraining order against Alesi.  In or about October 2007, Alesi executed a mortgage in favor of defendant GMAC.

During that same month, on October 25, 2007, Alesi filed a police report concerning certain items that he represented were stolen from the premises, including Rolex watches (Submariner and DateJust), his wedding band, a television, a DVD player, a Gibson guitar, an Erté painting, a bronze dolphin, a Japanese "Block" painting, an ivory statue and an "oriental dancer."[1]  On December 10, 2007, Alesi was convicted of simple assault against Krasner in Margate Municipal Court.

In or about February 2008, Alesi obtained homeowner's insurance from Certain Underwriters at Lloyd's of London ("Lloyd's").  Alesi and Krasner again attempted reconciliation and Alesi moved back into the premises in or around May 2008.  Alesi

---

[1]     This list of items is derived from the police report. No additional information was provided about the items in the report.

moved out again in June 2008, and on July 19, 2008, Krasner obtained another temporary restraining order against Alesi. While Krasner was at the police station presumably obtaining the retraining order, Alesi was permitted to return to the premises to remove certain items. Alesi and his father removed additional items in August 2008, after which Alesi vacated the premises.

By this time, Alesi had defaulted on his mortgage with GMAC and was approximately one year in arrears on his payments.[2] The parties believe Krasner left the premises permanently on November 30, 2008.[3]  Alesi testified that he had the water and electricity turned off sometime before November 30, 2008.[4]

Sometime during November 30-December 1, 2008, the Margate City Police were dispatched to the premises after a neighbor reported that water was running out of the front door. The police found the interior of the premises extensively damaged. Certain fixtures such as sinks, countertops, and toilets were destroyed, the walls and ceiling were damaged, and the ceiling seemed in danger of collapse as a result of the water damage. On December 1, 2008, Alesi was notified of the damage by the police. Alesi and his father inspected the premises and found that all the faucets in

---

[2]    By July 2009, Alesi owed GMAC a mortgage balance of approximately $526,275.25.

[3]    Some accounts state that she left on November 20, 2008.

[4]    If this testimony is true, then it is difficult to understand how water damage could have occurred after that date.

4

the house had been turned and left on.

Alesi and GMAC submitted insurance claims to Lloyd's. David M. O'Brien ("O'Brien") was retained by Lloyd's as the adjuster.  Within two or three days, O'Brien contacted Alesi and on December 10, 2008, O'Brien met with Alesi to review the damage. Alesi provided O'Brien with a preliminary, handwritten contents list of personal items that Alesi represented were either removed or damaged as a result of the loss.  O'Brien estimated that the costs necessary to repair the building would be $69,023, and that Alesi could claim $11,000 more if other repairs were completed. Alesi submitted a building estimate from Brindisi Builders for repairs, first in the amount of $210,000, and then later in the amount of $154,176.  Alesi also claimed a loss of personal contents in an amount more than $100,000, and lost rental income of $9,000.

On December 28, 2008, O'Brien sent Alesi an email reminding him to get in touch with him and to submit a final claim for contents.  Alesi responded on January 14, 2009 that he had about 75% of the receipts and on February 8, 2009 stated to O'Brien that he needed to get in touch with Krasner before he could complete his contents list.  On March 8, 2009, O'Brien sent Alesi an email asking him to present his contents claim "ASAP."  The parties dispute whether a contents list was provided at that time or not until September 2009, although both Lloyd's and Alesi acknowledge that Alesi needed to speak with Krasner about what

5

items had been in the house, and that Alesi's efforts were hampered by the retraining order against him.

During her deposition, Krasner testified that a washer and dryer contained on Alesi's contents list were given to her by her father and removed to a tanning salon where she worked after Alesi turned off the water supply to the premises. She testified Alesi knew of the removal of the washer and dryer. Krasner also testified that she saw Alesi wearing a Rolex watch in February 2010 that he had included on his contents list. Krasner further testified that Alesi sold some of the artwork to his sister because he was experiencing financial difficulty. Krasner also testified that Alesi had taken other items later claimed to have been lost or destroyed. Although her testimony is not a model of clarity, it appears that Alesi brought some of the items he removed back to the premises only to have removed them all at a later date and perhaps stored them at his sister's house.

Alesi admits Krasner provided this testimony, but argues that her testimony should be barred because Krasner asserted her Fifth Amendment privilege and refused to testify to matters regarding: whether she removed property from the premises when she left in November 2008; her knowledge or information about the damage to the premises; who knew that she was leaving and who helped her move; and the condition of the premises when she left and whether the water had been turned on.

Alesi also submitted a lost rent claim of $9,000 based on a lease with his cousin's son, Chris Brindisi, for rental of the premises in the summer of 2008.  The premises could not be leased, however, because Krasner was residing at the property at that time and had a restraining order in effect against Alesi.  Alesi maintains that the property could have been rented after Krasner left if the property had not been destroyed.

After filing a complaint in mortgage foreclosure in January 2008, GMAC agreed to permit Alesi to sell the premises "as is" in a short sale in exchange for full and final payment of the mortgage.  In or about March 2010, the premises was sold to a third party for $325,000, an amount substantially less than the amount owed on the mortgage.

On April 8, 2010, Lloyd's filed this action seeking declaratory relief that it did not owe insurance coverage to defendants for damages sustained to the premises because such damage was caused by Alesi or his estranged wife, or both, and because Alesi misrepresented facts to its investigator.  Alesi filed an answer and counterclaim against Lloyd's alleging breach of contract and bad faith for failing to pay the insurance claim. Lloyd's filed an amended complaint on June 3, 2010, adding a claim against Alesi under the New Jersey Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. § 17:33A-1 to 30.  GMAC filed a counterclaim against Lloyd's seeking insurance coverage for damage to the

7

premises, and a cross-claim against Alesi arguing that any insurance payments paid to Alesi belong to GMAC.

## II.  **DISCUSSION**

### A.  **Jurisdiction**

Plaintiff alleges that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The plaintiff, Certain Underwriters at Lloyd's of London, is incorporated under the laws of the United Kingdom, and has a principal place of business in London, England.  Defendant, GMAC Mortgage, is incorporated in the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania.  Defendant, Ally Bank Corporation, is incorporated in the State of Utah with its principal place of business in Michigan.  Defendant, Salvatore Alesi, is an individual and citizen of the Commonwealth of Pennsylvania.

### B.  **Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322,

106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)(quoting <u>Fed. R. Civ. P. 56©</u>)).

       An issue is "genuine" if it is supported by evidence "such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (quoting <u>Anderson</u>, 477 U.S. at 255, 106 S. Ct. 2505).

       Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex</u>, 477 at 323, 106 S. Ct. 2548. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u> at 324, 106 S. Ct. 2548. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57, 106 S. Ct. 2505. A party opposing summary judgment must

do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**C.   Lloyd's Motion for Partial Summary Judgment**

**(1)   Personal Property Loss**

In its motion for partial summary judgment, Lloyd's seeks a declaratory judgment that it has no duty to provide insurance coverage for Alesi's alleged personal property losses.  Lloyd's argues that an insurance policy may be voided by an insurer for a willful misrepresentation of a material fact and that Alesi made numerous material and willful misrepresentations to Lloyd's investigator.

Alesi has claimed in excess of $100,000 in personal property damage for items he claimed were either destroyed or removed from the premises during the loss.  Lloyd's maintains that the list of contents that was provided by Alesi almost eleven months after the loss, despite repeated attempts by their investigator David O'Brien to secure a contents list, contains items that were not in the premises at the time when the property was vandalized during November 30-December 1, 2008.  The items Lloyd's disputes on the list are:(1) three Samurai swords[5]; (2) a

_____

[5]      Lloyd's also states that "guns" were removed from the premises, but provides no citation to the record to support this statement.  Also, Lloyd's does not state that guns were included on the preliminary contents list and does not state that Officer Costa advised him that the guns were removed by the Margate City

Rolex watch; (3) a washer and dryer; (4) three McKnight paintings/limited prints;[6] (5) guitars; (6) an "Erté";[7] (7) a "dancing lady";[8] (8) an Ansel Adams;[9] (9) a dolphin on a pedestal;[10] (10) certain furniture items; (11) a Polaroid television; (12) Chanel handbags; (13) stereo speakers; and (14) a Sony Vaio 17" screen laptop.

Alesi states that he received a call from the Margate City Police Department that his home had been "annihilated" and that upon arriving at the premises saw that the water faucets had been turned on flooding the premises, and that the countertops, toilets, and other fixtures had all been smashed to pieces. Alesi states that he remained in contact with O'Brien and explained that the delay in providing the contents list was due to his inability to find out from Krasner what items were in the house when she left. Alesi argues that any testimony by Krasner that certain

---

Police Department. As such, this unsupported assertion will not be considered by the Court as part of this motion.

[6]    The Court assumes this refers to artwork by Thomas McKnight, the American artist.

[7]    The Court assumes this refers to artwork by Romain de Tirtoff, the Russian-born French artist and designer known by the pseudonym Erté.

[8]    The Court assumes this is artwork, artist unidentified.

[9]    The Court assumes this refers to artwork by Ansel Adams, the American photographic artist.

[10]    The Court assumes this is artwork, artist unidentified.

items on his contents list had been previously removed, or known to have been previously removed, by Alesi should be barred because Krasner asserted her Fifth Amendment privilege against self-incrimination.  Alesi argues that it is unfair to rely on Krasner's testimony at this stage of the proceedings because his counsel was deprived of the right to cross-examine her and impeach her testimony.  Alesi points out that Krasner was the last person to occupy the premises and the destruction to the premises occurred less than 24 hours after she left.

Alesi has raised some serious concerns regarding Krasner's testimony.  Not only did Krasner invoke the protections of the Fifth Amendment and not testify to certain issues, Alesi's counsel was unable to fully cross examine her.  However, while the Court cannot weigh the credibility of a witness on summary judgment, see Marino, 358 F.3d at 247, Alesi has not shown that her testimony should be barred at this stage as a matter of law.

The Fifth Amendment privilege against self-incrimination can be raised by a witness in civil proceedings during discovery, and at trial.  See McKune v. Lile, 536 U.S. 24, 55, 122 S.Ct. 2017, 2036 (2002) (acknowledging that the Fifth Amendment prohibition against self-incrimination allows a witness "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.") (citations omitted).  The court has

12

discretion to fashion an appropriate remedy based on the particular
facts of the case, and should do so by balancing the interests of
the parties.  S.E.C. v. Graystone Nash, Inc., 25 F.3d 187, 192 (3d
Cir. 1994) (finding that trial court must balance interests of
party claiming privilege with adversary's entitlement to equitable
treatment); U.S. v. Certain Real Property and Premises Known as
4003-4005 5th Ave., Brooklyn, N.Y., 55 F.3d 78, 84-85 n.7 (2nd Cir.
1995) (finding trial court has discretion stemming from its broad
discretion to control and fashion remedies for abuses of the
discovery process and may adopt remedial measures or impose
sanctions if it appears Fifth Amendment has been used in a way to
hinder discovery or obstruct a proceeding) (citations omitted).

    Here, it is not a party who is invoking the privilege,
but a non-party witness.[11]  Neither plaintiff nor defendants have

---

[11]    In facts not analogous to this case, the Third Circuit
addressed the issue of a non-party witness invoking the Fifth
Amendment privilege against self-incrimination in Rad Services,
Inc. v. Aetna Cas. and Sur. Co., 808 F.2d 271, 272 (3d Cir.
1986).  In Rad Services, the Third Circuit held that "the trial
court did not err in admitting as evidence the depositions of the
non-party witnesses who exercised their Fifth Amendment
privileges, nor in permitting the jury to draw adverse inferences
therefrom." Id.; see Graystone, 25 F.3d at 190 ("Unlike the rule
in criminal cases ... reliance on the Fifth Amendment in civil
cases may give rise to an adverse inference against the party
claiming its benefits) (citing Baxter v. Palmigiano, 425 U.S.
308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821 (1976)).  The
Third Circuit affirmed the district court's decision to permit as
evidence the depositions of two witnesses who were employees of
the defendant in which they invoked the Fifth Amendment and
refused to testify regarding their employer's alleging dumping of
hazardous materials.  Id. at 280-81.

invoked the Fifth Amendment privilege so there is no concern that they will attempt at trial to undermine their adversary with surprise testimony.  See Graystone, 25 F.3d at 191.  The witness invoking the Fifth Amendment is Alesi's estranged ex-wife, Krasner, a non-party witness, who has refused to testify as to certain matters concerning the contents and condition of the premises and her vacating of the premises.[12]

We view this issue as one within the Court's discretion, see Graystone, 25 F.3d at 192, and can discern no reason why Krasner's testimony should be barred simply because she invoked the Fifth Amendment with regard to certain aspects of her testimony. We note that, with some exceptions,[13] Krasner's testimony,

_____

[12]  Although Krasner was previously married to Alesi and presumably shared possession of certain items now at issue in this insurance claim, she obtained several restraining orders against him in a contentious marriage.  Based on these facts, it does not appear that her interests are aligned with her husband's at this time.

[13]  Some of the "evidence" is unverified or unsworn statements, or contain no reference to the record.  See Fed.R.Civ.P. 56 (c)(1).  For example, Lloyd's states that Alesi included three Samuri swords on his preliminary contents list as part of the loss, but that these swords had been confiscated by the Margate City Police Department.  In support of this statement, Lloyd's refers the Court to Exhibit Q which is O'Brien's report dated January 2, 2009.  Although the report includes Alesi's handwritten, preliminary contents list which includes the three Samuri swords, it does not includes any copy of the Margate City police report or any deposition testimony by Officer Costa.  Upon the Court's review of the certification of Michael Needleman, Esquire, dated April 14, 2011, the attached copy of Alesi's typed contents list dated September 20, 2009 does not appear to contain the three Samuri swords and Lloyd's does not allege that it does.  Accordingly, this evidence does not

14

which in any event is not directly controverted by Alesi or any
other proffered evidence, is corroborated by other evidence in the
case.  For example, Lloyd's presents an October 25, 2007 report
that Alesi filed with the Margate City Police Department which
includes a list of items that Alesi claims were stolen.  These
items include his platinum wedding band, Rolex watches (Submariner
and DateJust), Erté print, and bronze dolphin.  Alesi also included
these same items on his final September 30, 2009 contents list

---

show that Alesi intentionally misrepresented that three Samuri
swords were removed.  There is no verified or authenticated
evidence from Officer Costa and the later contents report
submitted by Alesi does not contain the swords.

  Additionally, in its reply, Lloyd's states that Officer
Costa noted in his report that a neighbor saw a truck parked at
the premises, before December 1, 2008, with an advertisement on
it that read "We'll buy your used junk."  Again, however, Lloyd's
does not cite to any police report, does not cite to any
deposition testimony by Officer Costa or the neighbor, and does
not cite to any other sworn record in support of this claim.
Lloyd's further argues that the "testimony" of two witnesses,
Joseph F. Hughes, III, and Michael David Lewkowski, show that the
premises was empty prior to the date of loss.  Attached to the
attorney certification were not copies of deposition testimony or
sworn statements from these witnesses, but rather typed
interviews between Lloyd's investigator and the witnesses that
contain no signature line, are not signed, and not sworn to under
penalty of perjury.  Although the statements do support Lloyd's
argument that the premises was virtually empty sometime prior to
December 1, 2008 (the dates are not certain), it is essentially
hearsay, and is not in a form that can be relied upon at summary
judgment.

  Inadmissible hearsay may not be considered for purposes of
summary judgment.  Smith v. City of Allentown, 589 F.3d 684, 693
(3d Cir. 2009).  While hearsay can be considered on summary
judgment if it is presented in a form that is admissible at
trial, see Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware
Co., Inc., 998 F.2d 1224, 1235 n. 9 (3d Cir. 1993), plaintiff
failed to demonstrate here how unsigned transcribed interview
notes could be admissible.

provided to O'Brien as part of his claim for personal losses (i.e., platinum wedding band, DateJust Rolex, Erté lithograph, and "Dolphin in Air" bronze statue).

In addition, Lloyd's cites to a signed Certification of Salvatore Alesi dated January 18, 2008 filed with the Superior Court of New Jersey as part of his divorce proceedings stating that when he returned to the premises in October 2007 to retrieve his personal belongings, certain items were not at the premises, including: a platinum wedding band, Erté oriental lady painting, bronze "Dolphin in Air," oriental antique, "Brumese (sic) dancer," six dining room chairs, leather couch, kitchenware, dishes, pots, pans, utensils, and a Japanese "block" painting.  These items are also listed on Alesi's September 30, 2009 contents list provided to O'Brien as part of his claim for personal losses.  Also, Alesi filed another signed certification with the Superior Court of New Jersey dated March 7, 2008, stating that during the week of October 15, 2007, Krasner had the premises "cleared out of all items" and that the premises as of October 2007 "was empty."  Alesi further states, "[t]his included all my property as well.  To this day, I still have no idea where this property is located and who is watching same."  Alesi also states that after he was removed from the premises and allowed to return to retrieve his personal items, that Krasner had "removed and cleared out my home office including, files, my computer, etc."

16

Krasner also submitted a signed certification to the Superior Court of New Jersey dated March 6, 2008, stating that Alesi removed several pieces of art worth over $20,000 from the premises.  Krasner's divorce lawyer, Stephen Patrizio, sent a letter to Craig Sobel, Esquire, dated January 14, 2008, stating that Krasner would vacate the premises and return all of Alesi's personal belongings in exchange for $25,000.  The letter also states that Krasner would retain the handbags but that Alesi's watch was in a pawnshop.  Lloyd's provided a copy of a signed four month loan receipt from Royal Pawn located in Atlantic City, New Jersey, indicating that Sherri Alesi (Krasner) pawned a gentleman's two-tone Rolex, and that if the merchandise was not redeemed or renewed by January 6, 2008, it would be forfeited.  On July 26, 2008, Krasner filed a police report with the Margate City Police Department stating that her husband went back to their home with the police and stole her three Chanel handbags, and driver's license.[14]  Alesi included Chanel handbags on his final contents list for $5,060.00.

Lloyd's argues that based on this information, the evidence shows that many items claimed by Alesi to have been damaged or destroyed during the vandalism on November 30, 2008 - December 1, 2008, had actually been stolen or removed by either

---

[14]   The report is handwritten and difficult to read in spots but appears to also allege that Alesi stole her contacts.

17

Alesi or Krasner, and known by Alesi to have been stolen or removed.  Lloyd's states that Alesi made material misrepresentations to Lloyd's insurance adjuster and that pursuant to Alesi's insurance policy he has forfeited his claim.

Under New Jersey law, insurance "policies should be construed liberally in [the insured's] favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'"  <u>Longobardi v. Chubb Ins. Co. of New Jersey</u>, 582 A.2d 1257, 1260 (N.J. 1990) (citations omitted). "Notwithstanding that premise, the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability."  <u>Id.</u> (citations omitted).

Lloyd's argues that under the insurance policy, Section I. B.9.a. and b., Lloyd's will insure for loss from attempted theft and loss when it is likely the property has been stolen, unless the theft is caused by an "insured."  Lloyd's also refers to Section I.-Exclusions.8 which states that Lloyd's does not insure for any loss due to intentional loss "arising out of any act an 'insured' commits or conspires to commit with the intent to cause a loss." Lloyd's also states that pursuant to Section I-Conditions.Q, it does not provide coverage to "insureds" who have intentionally concealed or misrepresented any material fact or circumstance, engaged in fraudulent conduct, or made false statements relating to

18

the insurance.  Finally, under the "Certificate Provisions" -
"Claim Notifications" paragraph 2.a., the policy provides that
"[i]f the Named Insured shall make any claim knowing the same to be
false, fraudulent, as regards amount or otherwise, this insurance
shall become void, and all claims hereunder shall be forfeited."
There is no dispute that Alesi and Krasner were "insureds" under
the policy.

Despite certain evidentiary problems as noted above,
Lloyd's has presented uncontroverted admissible evidence showing
that many items claimed by Alesi to have been removed or damaged
during the date of loss were, in fact, stolen or removed prior to
that time.  There is a tortured history surrounding various items
being removed by either Alesi or Krasner during a contentious
marriage and subsequent divorce proceedings, but there is no
evidence from Alesi that any of the items being returned to the
premises prior to the date of loss.[15]  Many items that Alesi claims
were destroyed or removed during the loss were the same items that
he claims were stolen or removed previously, and Alesi does not
provide any evidence that any of the items had been returned.
Under the terms of the insurance policy, the various

---

[15]    There is testimony from Krasner that Alesi removed
items in October 2007, returned some of the items to the premises
later but removed them again within the year.  Although this
suggest some items were returned at some point after Alesi
reported them stolen, this testimony clearly does not help Alesi
since Krasner states he was doing the removing.

19

misrepresentations made by Alesi permits Lloyd's to deem Alesi's claim forfeited.  Therefore, Lloyd's motion for partial summary as to Count I of its amended complaint regarding Alesi's claim for personal contents will be granted.

### (2) Lost Rental Claim

Alesi has claimed he lost rental income of $9,000 in connection with the vandalism to the premises.  His claim was based on a proposed lease with his cousin, Chris Brindisi, to rent the premises on a trial basis for 90 days for $9,000.  The lease was not carried out because it would have required Krasner to vacate the premises.  A judge presiding over the domestic matter between Alesi and Krasner had apparently permitted Krasner to remain in the premises thereby nullifying the lease.  Lloyd's argues that Alesi knew he could not generate rental income and, therefore, misrepresented his claim.

Alesi maintains that although he was prohibited by the judge in his divorce proceedings from renting the property in the summer of 2008, there was nothing to prevent him from doing so after Krasner vacated the premises.  Lloyd's responds that the premises was in foreclosure and, therefore, Alesi could not rent the premises.

Although, as stated in his March 7, 2008 Certification to the Superior Court of New Jersey, Alesi admits that the premises was in mortgage default since the summer of 2007, and a formal

mortgage foreclosure action was filed and served in January 2008, in the amount of $546,000, Lloyd's has not presented any law that precludes an owner from renting a foreclosed property.  In fact, it would seem that if Alesi was able to secure a paying tenant after Krasner moved out (assuming the loss had not occurred), he may have been able to negotiate with GMAC.  What is more problematic, however, is that Alesi has not furnished any purported lease between him and Mr. Brindisi or anyone else.  Lloyd's states that Alesi never provided a copy of the purported lease to Lloyd's during the adjustment period.  There is no statement from any party whether a signed lease exists, and no signed lease was submitted to the Court.  There is certainly no testimony or other evidence that a lease was entered into after Krasner moved out.  Therefore, there is no evidence that shows any intent to rent the premises after Krasner moved out.  Thus, given that Alesi was precluded from renting the premises until Krasner moved out, presumably sometime in November 2008, and given that Alesi has no signed leased, or proposed lease, or affidavit from Mr. Brindisi, in support of his claim to rent the premises after Krasner moved out, Lloyd's was justified in denying the loss rental claim under the policy. Accordingly, Lloyd's motion for partial summary judgment as to Count I of its amended complaint regarding Alesi's claim for lost

rental income will be granted.[16]

### (3)  New Jersey Insurance Fraud Prevention Act

Lloyd's alleges that Alesi violated the New Jersey Insurance Fraud Prevention Act ("IFPA") sections 17:33-A-4(a)(1),[17] 17:33-A-4(a)(3)[18], and 17:33-A-4(a)(5)(a)-(b)[19].  According to the

---

[16]    Although Lloyd's argues that Alesi misrepresented his lost rental income claim, we find only that Alesi failed to provide the proper documentation in support of his claim. Therefore, although Lloyd's is justified in denying the claim, it has not shown sufficient evidence that Alesi intentionally misrepresented the facts regarding the lost rent.  Nonetheless, for the reasons stated above, Lloyd's is entitled to summary judgment.  The remaining claim under Count I is a claim for property damage to the premises which was not raised by Lloyd's in its motion for partial summary judgment.

[17]    Section 17:33A-4(a)(1) states, [a] person or a practitioner violates this act if he ... [p]resents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim;

[18]    Section 17:33A-4(a)(3) states, [a] person or a practitioner violates this act if he ... [c]onceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled;

[19]    Section 17:33A-4(a)(5)(a)-(b) states, [a] person or a practitioner violates this act if he ... [c]onceals or knowingly fails to disclose any evidence, written or oral, which may be relevant to a finding that a violation of the provisions of paragraph (4) of this subsection ... has or has not occurred.  A person or practitioner violates this act if he knowingly assists, conspires with, or urges any person or practitioner to violate any of the provisions of this act.

IFPA statute, "[t]he purpose of this act is to confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud, eliminating the occurrence of such fraud through the development of fraud prevention programs, requiring the restitution of fraudulently obtained insurance benefits, and reducing the amount of premium dollars used to pay fraudulent claims."  N.J.S.A. 17:33A-2.  The IFPA must be construed "liberally to accomplish the Legislature's broad remedial goals" of imposing civil penalties to "compensate the State for the costs incurred as a result of investigating and prosecuting insurance fraud."  Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 173-74, 892 A.2d 1240, 1246 (2006)(citations omitted). "Any insurance company damaged as the result of a violation of any provision of this act may sue therefor in any court of competent jurisdiction to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorneys fees."  N.J.S.A. 17:33A-7a; see Lincoln Nat. Life Ins. Co. v. Schwarz, No. 09-03361, 2010 WL 3283550, at *16 (D.N.J. August 18, 2010).

        The applicable burden of proof to prove a violation of the IFPA is a preponderance of the evidence.  Land, 186 N.J. at 180 (rejecting a clear and convincing evidence standard).  This is a lower standard than proving common law fraud which must be proved by clear and convincing evidence.  See 539 Absecon Blvd., L.L.C. v.

Shan Enterprises Ltd. Partnership, 406 N.J.Super. 242, 269, 967 A.2d 845, 861 (App.Div. 2009); Foley, Inc. v. Fevco, Inc., 379 N.J.Super. 574, 585 n.9, 879 A.2d 1242, 1249 n.9 (App.Div. 2005). Also, "[u]nlike common law fraud, proof of fraud under the IFPA does not require proof of reliance on the false statement or resultant damages ... nor proof of intent to deceive." Lincoln Nat., 2010 WL 3283550, at *16 (citing Land, 186 N.J. at 174-75, 892 A.2d 1240; State v. Nasir, 355 N.J.Super. 96, 106, 809 A.2d 796, cert. denied, 175 N.J. 549, 816 A.2d 1051 (2003)).

Lloyd's has shown that it is entitled to summary judgment on its claim that Alesi has violated the IFPA. As explained above, Alesi filed signed certifications with the Superior Court of New Jersey stating that certain items had been removed and were not located at the premises. Alesi included some of those same items in his final contents list to O'Brien as part of his insurance claim. Alesi has presented no evidence that any of the items he certified to the state court as removed were ever replaced before the date of loss. Although these facts support a violation of the IFPA, the October 2007 police report filed by Alesi and the testimony of Krasner provides additional evidence that Alesi reported items as part of his contents list that had been removed and never returned to the premises prior to the date of loss.

Therefore, following the remedial purpose of the IFPA, the uncontroverted facts show that Alesi made statements to Lloyd's

24

knowing that the statements contained false or misleading information.  See 17:33-A-4(a)(1).[20]  Accordingly, Lloyd's motion for partial summary judgment with regard to the IFPA claim will be granted.

### (3) Alesi's Counterclaim for Bad Faith

Alesi filed a counterclaim against Lloyd's for bad faith based on its failure to pay his insurance claim in excess of $155,000 in property damages, in excess of $100,000 in personal property damage, and approximately $9,000 in lost rents.  As explained above, judgment will be entered in favor of Lloyd's regarding the personal property and lost rental claims and, therefore, Alesi's bad faith with regard to those two claims will be dismissed.

With regard to Alesi's property damage claim, in order to prove a claim of bad faith under New Jersey law, a plaintiff must prove that: "1) the insurer lacked a 'fairly debatable' reason for its failure to pay a claim, and 2) that the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim."  Ketzner v. John Hancock Mutual Life Ins. Co., 118 Fed. Appx. 594, 599 (3d. Cir. 2004) (citing Pickett v. Lloyd's, 131 N.J.

_____

[20]    Although Lloyd's also cites to Sections 17:33-A-4(a)(3) and 17:33-A-4(a)(5)(a)-(b), Lloyd's has not presented specific argument under these sections.  This is not to say that Alesi has not violated these provisions, only that Lloyd's has failed to present the specific facts in support of each provision of the IFPA in its motion for partial summary judgment.

457, 621 A.2d 445, 454 (N.J. 1993)).  "To establish a bad faith claim, plaintiff must be able to establish, as a matter of law, a right to summary judgment on the substantive claim; if plaintiff cannot establish a right to summary judgment, the bad faith claim fails."  Id.

Alesi argues that Lloyd's has no evidence to support its claim that Alesi caused the damage to the premises.  Alesi states that Krasner left the premises within 24 hours of the damage being discovered and had exercised her Fifth Amendment right and refused to answer questions surrounding the circumstances of her leaving and the condition of the premises when she left.  Alesi also states that he provided Lloyd's with information that an individual named Tom Totarro was charged with theft on the premises months before the damage.[21]

Lloyd's responds that its investigator David O'Brien inspected the premises and prepared a repair estimate in the amount of $69,023, and that Alesi could claim approximately $11,000 more if other repairs were completed.  Alesi submitted two estimates, both prepared by his cousin, Michael Brindisi, the first showing repair costs in the amount of $210,000, and the second in the amount of $154,176.23.  Lloyd's maintains that on numerous occasions over a period of months, it attempted to reconcile the

---

[21]   No evidence was submitted in support of the alleged theft.

estimates, and spoke with Mr. Brindisi in an attempt to bridge the gap between the estimates. Mr. Brindisi testified that his first estimate of $210,000 was not prepared for insurance claim purposes. He also testified that he included a new heating and air-conditioning system to replace the original electric baseboard heat in the house prior to the loss. Brindisi further testified that he included items in the estimate that Alesi wanted, but that in Brindisi's opinion, would not be acceptable to the insurance company. Finally, Lloyd's notes that it became aware that Alesi was being investigated by the New Jersey Office of Insurance Fraud in connection with the November 30 - December 1, 2008 claim.

In light of the above, Lloyd's had a "fairly debatable" reason for its failure to pay Alesi's property claim. There was a large gap between the building estimates produced by Brindisi and that of its investigator, O'Brien. Brindisi told O'Brien that the estimate included new items that Alesi wanted included, not just repairs to the premises. Lloyd's also had serious questions regarding Alesi's contents claim and loss rents claim. In addition, Lloyd's was notified that Alesi was being investigated by the New Jersey Office of Insurance Fraud. Under all of these circumstances, Alesi cannot prove as a matter of law that Lloyd's acted in bad faith in not paying the property claim. Therefore, Lloyd's motion for summary judgment regarding Alesi's bad faith claim will be granted, and Alesi's counterclaim of bad faith will

be dismissed.

### (4) Request for Admissions

Lloyd's argues that since Alesi failed to timely respond to its requests for admissions, the requests should be deemed admitted.  Alesi admits that the requests were untimely, but asks the Court to excuse his delay and permit his responses to be served *nunc pro tunc.*

Federal Rule of Civil Procedure 36(a)(3) states:

> A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

Fed.R.Civ.P. 36(a)(3).

Lloyd's served its requests for admissions on or about June 17, 2010.  Alesi did not respond until August 10, 2010, which is past the thirty day deadline.  Alesi neither requested an extension from opposing counsel, nor filed a motion to amend or withdraw with the Court.  Under Federal Rule of Civil Procedure 36(b), "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.  Fed.R.Civ.P. 36(b).

"Courts have great discretion in deciding whether to withdraw or amend an admission." U.S. v. Branella, 972 F.Supp. 294, 301 (D.N.J. 1997) (citing United States v. Stelmokas, No.

92-3440, 1995 WL 464264, at *4 (E.D.Pa. Aug. 2, 1995), aff'd, 100 F.3d 302 (3d Cir. 1996)).  "Under Fed.R.Civ.P. 36(b) and case law in this Circuit, the party contesting amendment or withdrawal of the admission must demonstrate that prejudice will result from the amendment or withdrawal."  Id. (citing Gerlach v. Volvo Cars of North America, No. 96-1476, 1997 WL 129004, at *7 (E.D.Pa. March 17, 1997)).  "The court must also consider whether amendment or withdrawal of the admission will subserve the presentation of the merits of the case."  Id.

Alesi responded to the requests for admission well before the discovery deadline and a month before his deposition.  Lloyd's has not demonstrated that any prejudice will result if the admissions are withdrawn.  Conversely, allowing the admissions will result in summary judgment against Alesi.  Although Lloyd's has met its burden for summary judgment on the contents claim and loss rents claim, it has not moved for summary judgment on the property claim.  Permitting the admissions would effectively result in summary judgment on that claim as well because Alesi would have admitted that he caused or directed to be caused the property damage to the premises.  Accordingly, in order to insure that the matter is decided on the merits rather than by procedural default, we will deny Lloyd's motion to deem its requests for admission admitted.

29

**D.    GMAC's Motion for Partial Summary Judgment Against Lloyd's, and Lloyd's Cross-motion for Summary Judgment Against GMAC.**

GMAC moves for summary judgment on Lloyd's request for a declaratory judgment with regard to Alesi's property claim.  GMAC states that Lloyd's seeks a declaratory judgment on the property claim on the grounds that since Alesi committed the vandalism himself, no one is entitled to the proceeds of the policy.  GMAC argues that even if Alesi committed the vandalism, that GMAC as mortgagee would still be entitled to the proceeds.  GMAC notes that Section I - Exclusions-A.8 of the policy states that Lloyd's will not provide coverage for an "insured" who commits or directs an act with the intent to cause a loss, and that Section I-Conditions-Q, provides that Lloyd's will not provide coverage if the "insured" intentionally conceals or misrepresents a fact.  GMAC maintains that the definition of "insured" does not include it, the mortgagee.  GMAC argues that the policy contemplates the fact that mortgagees would be beneficiaries on the polices pursuant to Section I Conditions - K, which permits Lloyd's to pay the mortgagee named in the policy and that if Lloyd's denies the claim "that denial will not apply to a valid claim of the mortgagee" if the mortgagee satisfies certain conditions.

GMAC also states that Lloyd's claim that the short sale of the premises extinguished GMAC's rights to the proceeds under

30

the insurance policy was not raised in its amended complaint.  GMAC
argues that Lloyd's impermissibly raised the argument for the first
time on summary judgment.  Lloyd's responds that it learned of the
"short sale" during discovery and that because GMAC accepted
$325,000 as full and final satisfaction of the mortgage, that this
"short sale" terminated GMAC's insurable interest in the premises.
Lloyd's further argues that since the premises was sold after the
loss that it is not entitled to any of the insurance proceeds.

        Finally, GMAC argues that the allegations in its
counterclaim against Lloyd's should be deem admitted because
Lloyd's failed to respond to the counterclaim.  Lloyd's argues that
GMAC did not file a counterclaim against it.

        As a threshold matter, the issue is whether the
allegations in GMAC's counterclaim should be deemed admitted.
Lloyd's filed its complaint on April 8, 2010, against Alesi and
GMAC.  GMAC filed their answer on May 19, 2010, which included
affirmative defenses, a counterclaim against Lloyd's and a cross-
claim against Alesi (No. 13 on Docket).  Subsequently, Lloyd's
motion to amend its complaint was granted and Lloyd's filed its
amended complaint on June 3, 2010.  GMAC filed an answer to the
amended complaint on June 14, 2010 (No. 19 on Docket).  The answer
to the amended complaint did not contain any counterclaims or
cross-claims or affirmative defenses.  The next day, on June 15,
2010, GMAC filed an amended answer to the amended complaint

31

entitled "Answer to Amended Complaint, Cross-claim against
Salvatore Alesi" (No. 22 on Docket).  The amended answer not only
contained a cross-claim against Alesi, it also contained
affirmative defenses and a counterclaim requesting a judgment that
Lloyd's has a duty to provide insurance coverage for the damage to
the premises and the personal property losses and that such monies
should be paid to GMAC.  Lloyd's did not file a response to the
counterclaim filed on June 15, 2010.

     According to Fed.R.Civ.P. 12(a)(1)((B), "[a] party must
serve an answer to a counterclaim or cross-claim within 21 days
after being served with the pleading that states the counterclaim
or cross claim."  GMAC argues that since Lloyd's did not respond to
its counterclaim, pursuant to Fed.R.Civ.P. 8(b)(6),[22] the
allegations set forth in its counterclaim are deemed admitted.  In
presenting its argument, however, GMAC confuses the date that its
answer to the original complaint was filed (May 19, 2010) with the
date its amended answer to the amended complaint was filed (June
15, 2010).  In its brief, GMAC points out that it asserted a
counterclaim against Lloyd's in its answer filed on May 19, 2010

---

[22]    Rule 8(b)(6) states:

     An allegation--other than one relating to the amount of
     damages--is admitted if a responsive pleading is
     required and the allegation is not denied. If a
     responsive pleading is not required, an allegation is
     considered denied or avoided.

which is true.  Lloyd's responded that the amended complaint supersedes the complaint so that the answer to the original complaint is no longer operative, also a true statement.  Neither party, however, discusses the relevant pleadings.  As stated above, GMAC filed an answer to the amended complaint on June 14, 2010 that did not contain a counterclaim, but then filed an amended answer to the amended complaint on June 15, 2010 (not May 19, 2010) which did.  Although GMAC's June 15, 2010 filing contained a counterclaim, this fact is not accurately reflected on the docket.  The docket entry states only that GMAC filed an amended answer and cross claim against Alesi, and the title of the pleading itself only states that it is an amended answer.  Although Lloyd's does not raise any argument that it did not have notice of GMAC's counterclaim, given the confusion over the filing of the amended answer and its contents, the Court will not deem the allegations in the counterclaim admitted.  See Continental Cas. Co. v. Diversified Industries, Inc., 884 F.Supp. 937, 963 (E.D.Pa. 1995) (declining to enter default judgment on counterclaim for failure to respond to unclear pleading); accord U.S. v. Branella, 972 F.Supp. 294, 301 (D.N.J. 1997) ("Courts have great discretion in deciding whether to withdraw or amend an admission.") (citations omitted).

        The next issue is whether Lloyd's was required to amend its complaint in order to properly raise the claim that the short sale of the premises extinguished GMAC's rights to the proceeds

33

under the insurance policy.  Lloyd's states that the claim was not
included in the amended complaint because it was only made aware of
the short sale during the discovery process.  Lloyd's maintains
that if such an amendment is necessary, that it be granted leave to
amend its complaint to add the claim.

Amendments to pleadings are governed by Federal Civil
Procedure Rule 15, which provides that the Court "should freely
give leave when justice so requires."  Fed.R.Civ.P. 15(a)(2).  The
Third Circuit has shown a strong liberality in allowing amendments
under Rule 15 in order to ensure that claims will be decided on the
merits rather than on technicalities.  Dole v. Arco Chemical Co.,
921 F.2d 484, 487 (3d Cir. 1990); Bechtel v. Robinson, 886 F.2d
644, 652 (3d Cir. 1989).  An amendment must be permitted in the
absence of undue delay, bad faith, dilatory motive, unfair
prejudice, or futility of amendment.  Grayson v. Mayview State
Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (citing Foman v. Davis, 371
U.S. 178, 182 (1962)).

GMAC has not shown undue delay, bad faith, dilatory
motive, unfair prejudice, or futility of amendment.  Therefore,
Lloyd's would be permitted to amend its complaint.  Rather than
engage in a pure procedural exercise, however, another formal
amendment of the complaint is not necessary because the facts of
the claim are known by the parties.  Indeed, the parties have
established following facts in their summary judgment briefs.  GMAC

34

held a first mortgage on the premises, and held a valid mortgage at the time of the loss.  In January 2008, GMAC filed a complaint for foreclosure.  In February 2010, GMAC accepted a "short payoff" of the premises in the amount of $325,000 for sale of the premises "as is."  On March 8, 2010, Alesi sold the premises for $325,000 to a third party.  The issue is whether GMAC, by accepting the "short sale" as full and final satisfaction of the mortgage, after the date of loss, waived its right to collect any insurance proceeds from Lloyd's.

Lloyd's argues that "Whitestone doctrine" has been adopted in New Jersey and applies in this case to bar GMAC from receiving any insurance proceeds.  In Whitestone Savings and Loan Assoc. v. Allstate Ins. Co., 270 N.E.2d 694, 696 (1971), the Court of Appeals of New York held that a mortgagee who bid the full amount of the secured debt at the foreclosure sale in order to obtain the mortgaged property did not retain any insurable interest entitling it to sue on a fire insurance policy under a mortgagee loss payable clause.  The court in Whitestone based its ruling on the principle that "a mortgagee is entitled to one satisfaction of his debt and no more," so that "the bidding in of the debt to purchase the mortgaged property" cuts off other lower bidders and constitutes a satisfaction of the debt.  Id. at 696.  "Thus, when a mortgagee is named as the loss payee of a fire insurance policy, a fire occurs, and thereafter the mortgagee forecloses and receives

the full amount of the mortgage, the mortgagee is not entitled to the proceeds of the insurance policy." Amboy Nat. Bank v. Generali-U.S. Branch, 930 F.Supp. 1053, 1057-58 (D.N.J. 1996) (citing Whitestone, 270 N.E.2d at 694).

A Court in this District has held that the Whitestone doctrine was "essentially adopted by the New Jersey Supreme Court in 495 Corp. v. New Jersey Ins. Underwriting Assoc., 86 N.J. 159, 167-68, 430 A.2d 203 (1981)." Amboy, 930 F.Supp. at 1058. However, in 495 Corp., the New Jersey Supreme Court distinguished its case from Whitestone and relied instead upon Nationwide Mutual Fire Insurance Co. v. Wilborn, 291 Ala. 193, 279 So.2d 460 (1973). In 495 Corp., the court held that "where ... a mortgagee acquires title to the mortgaged premises by a conveyance from the defaulting mortgagor in lieu of foreclosure, and a fire occurs thereafter, the mortgagee-owner is entitled to be compensated for its loss, to the extent of available insurance moneys after payment has first been made to the superior mortgagee, if there is one." Id. at 205. Whereas, in Amboy, the court found that the Whitestone doctrine applied to bar the second mortgagee[23] from receiving the insurance proceeds because it chose to foreclose on the second mortgage after the loss. Id. at 1059. The court determined that even though the foreclosure price was only $100, which amount did not satisfy the

---

[23]    The Amboy case also dealt with the assignment of the mortgage which is not at issue in this case.

mortgage, the mortgagee was not entitled to the insurance proceeds. Id. (stating that if the mortgagee seeks to recover any deficiency, it may proceed against the mortgagor only on an indemnity theory; it no longer had any claim to the insurance proceeds).  Id. at 1059-60.  In contrast, GMAC relies upon Liberty Mut. Fire Ins. Co. v. Alexander, 374 N.J.Super. 340, 349, 864 A.2d 1127, 1133 (App.Div. 2005) which held that "[w]here ... a mortgagee's interest in the property has increased to ownership through its purchase of the property at a foreclosure sale, its coverage under the insurance policy also increases beyond its security interest."  Id. (citing 495 Corp., 86 N.J. at 165, 430 A.2d 203).

Based on the case law discussed above, the following principles emerge: (1) a mortgagee who forecloses and acquires title, and then a loss occurs, is entitled to the insurance proceeds up to the amount of the mortgage debt; but (2) a mortgagee who forecloses on the property after the loss is not entitled to insurance proceeds, but may look to the mortgagor for any deficiency.

This case is distinguishable from the above cases because GMAC did not foreclose on the property and receive title.  Rather, GMAC accepted a "short sale" for an "as-is" property and title to the premises passed to a third-party.  In this respect, GMAC would have even less of a claim to the insurance proceeds than a mortgagee who foreclosed after a loss because GMAC does not hold

title to the premises.  GMAC agreed, after the loss and destruction to the property, that Alesi could sell property to a third party and agreed to accept $325,000 on the unpaid mortgage debt as satisfaction of the debt.  GMAC holds no title and currently holds no mortgage on the premises.[24]  As such, GMAC has no interest in the insurance proceeds.

GMAC argues that it accepted the short sale because it was obligated to mitigate damages in the event of a breach of contract claim by Alesi.  There is no dispute that the premises was hazardous given the amount of water damage and subsequent growth of mold.  If the property was not sold "as is" in March 2010, it is likely that further damage would have occurred due to the mold and disrepair thereby further devaluing the property.  Having found a buyer at that time allowed GMAC to mitigate any potential damages for breach of the mortgage and limit potential liability.  See Banco di Roma v. Fidelity Union Trust Co., 464 F.Supp. 817, 826 (D.N.J. 1979) ("Even a party injured by a breach of contract is under a duty to mitigate damages.").  GMAC's duty to mitigate its damages, however, does not create a right to receive insurance proceeds.  GMAC has not presented any law that would support a theory that following a loss to real property, a mortgagee, who agrees to the sale of a property to a third party at a loss and

---

[24]   It is unknown who the current mortgagee of the premises is, but GMAC has not indicated that they have any current mortgage interest.

accepts a certain sum in full and final satisfaction of the mortgage indebtedness, maintains an interest in receiving insurance proceeds.

Therefore, GMAC's motion for partial summary judgment against Lloyd's will be denied and Lloyd's cross motion for summary judgment will be granted.

### (E)   GMAC's Motion for Partial Summary Judgment Against Alesi

GMAC also seeks partial summary judgment against Alesi arguing that any insurance proceeds issued to Alesi with regard to the property claim should be awarded to GMAC.  Alesi maintains that he is entitled to the insurance proceeds because GMAC relinquished any claim for the insurance proceeds when it accepted the proceeds from the short sale as full and final satisfaction of the debt.

As stated above, GMAC does not have a right to the insurance proceeds after the sale of the property to a third party. However, the case law cited above contemplates that in the case of a mortgagee who has foreclosed on a property after the loss, the mortgagee may look to the mortgagor for any deficiency.  Even though GMAC agreed to a "short sale" instead of a foreclosure, GMAC may look to Alesi should Alesi be entitled to any insurance proceeds.[25]

In March 2010, GMAC permitted Alesi to sell the property

---

[25]    There was no evidence submitted that GMAC sought or obtained a deficiency judgment against Alesi.

39

for $250,000 less than owed on the mortgage due to poor condition
of the premises.  The pay-off letter issued by GMAC to Alesi dated
February 18, 2010, states that the letter confirms GMAC's
acceptance of the short payoff of the premises.  GMAC agreed to
accept the proceeds generated by the $325,000 "as is" sale as "full
and final satisfaction on the first mortgage of indebtedness,"
subject to certain conditions including "SELLER TO NET ZERO." (all
caps in original).

GMAC argues that the letter stating that seller was to
net zero shows that Alesi is not entitled to any insurance
proceeds.  Alesi responds that the letter stating seller to net
zero only referred to the short sale of the premises and not to any
insurance proceeds.  Alesi maintains that the insurance proceeds do
not constitute proceeds from the sale of the premises.

In addition, Alesi, seemingly to obtain some assurance
that GMAC would not claim any insurance proceeds, requested that
GMAC sign a general release of claim whereby GMAC would agree to
waive its rights to any insurance proceeds concerning the Lloyd's
policy, and the insurance proceeds would be paid directly to Alesi.
GMAC did not sign the release.  Even so, Alesi testified that he
understood that GMAC's acceptance of the sale proceeds satisfied
the loan completely and released its claim to the insurance
proceeds.

The request by Alesi for GMAC to sign the release shows

40

an intent by Alesi to have GMAC release any right to the insurance proceeds, and the refusal by GMAC to sign it shows an intent by GMAC to maintain any right it may have to the insurance proceeds. Other than that, however, the unsigned release carries no weight and does not grant or deny any rights to either party.

The February 18, 2010 letter, however, does create a triable issue of fact.  The letter is clear that the agreement between GMAC and Alesi was subject to certain conditions, including "SELLER TO NET ZERO."  The issue is whether this "net zero" condition was understood by the parties to include any insurance proceeds.  As such, this ambiguity creates a genuine issue of material fact that must be decided by a jury.  See Great Atlantic & Pacific Tea Co., Inc. v. Checchio, 335 N.J.Super. 495, 502, 762 A.2d 1057, 1061 (App.Div. 2000) ("The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury.") (citations omitted).[26]

Therefore, GMAC's motion for partial summary judgment

---

[26]     Alesi also argues that having accepted the proceeds from the sale, by letter dated March 14, 2010, GMAC cancelled the insurance policy it was maintaining on the premises.  The March 14, 2010 letter states that the "lender-placed insurance" GMAC obtained on the property was cancelled due to the loan being paid in full.  The "lender-placed insurance" appears to be separate from the Lloyd's policy, and it does not weigh in favor of either Alesi or GMAC with regard to the terms and conditions under the Lloyd's policy.

against Alesi will be denied.

### III. **CONCLUSION**

For the aforementioned reasons, Lloyd's motion for partial summary judgment against Alesi will be granted in its favor as to the personal contents claim, the lost rental claim, and Alesi's bad faith claim.  Lloyd's motion will be granted in part and denied in part as to its claim of violation of the New Jersey Insurance Fraud Prevention Act.  Lloyd's motion regarding its requests for admissions directed to Alesi will be denied.  GMAC's motion for partial summary judgment against Lloyd's will be denied, and Lloyd's cross-motion for summary judgment will be granted with regard to GMAC's claim to the insurance proceeds for the property claim.  GMAC's motion against Alesi on grounds that Alesi agreed to "net zero" on the sale of the premises including the insurance proceeds will be denied due to the ambiguity of the agreement.

An Order will be filed consistent with this Opinion.


  s/Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.

Dated:   December 30, 2011

At Camden, New Jersey

42